UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

SOULEYMANE M'BAYE,                    :

                Plaintiff,       :

      - against -                   :

WORLD BOXING ASSOCIATION,             :

              Defendant.       :

- - - - - - - - - - - - - - - - - -x

SOULEYMANE M'BAYE,                    :

                Plaintiff,       :

      - against -                   :

NEW JERSEY SPORTS PRODUCTION, INC.,:
d/b/a MAIN EVENTS, and PATRICK C.
ENGLISH,                              :

              Defendants.      :

- - - - - - - - - - - - - - - - - -x

05 Civ. 9581 (DC)

**MEMORANDUM DECISION**

06 Civ. 3439 (DC)

**APPEARANCES:**   (see last page)

**CHIN, District Judge**

        At several points in the years from 2002 to 2006,
plaintiff Souleymane M'Baye was the number one rated Official
Contender of the World Boxing Association (the "WBA") in the
super lightweight division.  Per WBA rules, M'Baye, as Official
Contender, was entitled to fight the division champion for the
World Champion title within a certain time period.  M'Baye,
however, was bypassed several times, and other, lower-ranked
boxers were given the opportunity to fight for the championship
ahead of him.

M'Baye sued the WBA for breach of contract, violation

of the Muhammad Ali Boxing Reform Act (the "Ali Act"), unjust

enrichment, and other claims. M'Baye v. World Boxing Ass'n, No.

05 Civ. 9581 (DC). He brought a separate but related suit

against promoter New Jersey Sports Production, Inc. d/b/a Main

Events ("Main Events") and attorney Patrick English ("English")

for tortious interference with contract and other claims. M'Baye

v. New Jersey Sports Prod., Inc., No. 06 Civ. 3439 (DC).[1]  Both

cases are before me and were consolidated for discovery.

Defendants in the two actions now move separately for

summary judgment to dismiss the complaints. For the reasons that

follow, the WBA's motion in M'Baye I is granted in part and

denied in part. Main Events' and English's motions in M'Baye II

are granted, and the complaint against them is dismissed. Main

Events also moves to strike an expert report by Duke McKenzie and

to preclude McKenzie from testifying as an expert witness. As I

am granting its summary judgment motion, its motion to strike is

denied as moot.

## BACKGROUND

### A.    The Facts

The facts in these related actions overlap and have

been discussed extensively in the Court's prior decisions. See

M'Baye II, No. 06 Civ. 3439 (DC), 2007 WL 431881 (S.D.N.Y. Feb.

---

[1]      In this decision, I refer to the first case against the
WBA as "M'Baye I." I refer to the second case against Main
Events and English as "M'Baye II."

2

7, 2007) (denying in part and granting in part defendants'
motions to dismiss); M'Baye I, 429 F. Supp. 2d 660 (S.D.N.Y.
2006) (denying in part and granting in part plaintiff's motion
for preliminary injunction).  I summarize the relevant facts
here.  For purposes of deciding defendants' summary judgment
motions, the facts have been construed in the light most
favorable to M'Baye, and conflicts in the evidence have been
resolved in his favor.

1.    **The Parties**

    a.    **M'Baye**

        M'Baye is a professional boxer who was born and lives
in France.  (Third Am. Compl. ¶ 3).  He fights in the super
lightweight division.  As of February 2006, his professional
fight record was thirty-three victories and one defeat.  M'Baye
I, 429 F. Supp. 2d at 662.

    b.    **The WBA**

        The WBA is a private, non-profit, membership
organization that sanctions professional championship boxing
matches.  (Mendoza Decl. ¶ 2).  It also ranks professional boxers
in different weight classes.  (Id.).  Fighters pay fees to the
WBA to sanction fights.

    c.    **Main Events and Patrick English**

        Main Events is a boxing promoter and registered member
of the WBA.  (English Decl. ¶ 5).  English has acted as general
outside legal counsel for Main Events and also as attorney for

3

Carlos Maussa, one of the fighters who was permitted to fight for the championship ahead of M'Baye.  (Id. ¶¶ 1, 4).

## 2.    The WBA's Rules and Regulations

WBA championship bouts are governed by the WBA's Rules and Regulations.  (Mendoza Decl. ¶ 5).  The regulations are complex; there are various types of "champions," including the "World Champion" of the WBA and different types of "super champions" -- such as "Unified Champion," "Undisputed Champion," and "Super Champion," among others -- who hold the titles of the WBA and at least one other sanctioning organization.  See M'Baye I, 429 F. Supp. 2d at 662-63; see also WBA Reg. 5.2.5.

WBA regulations require champions and super champions in the different weight classes to defend their titles within certain time periods.  Regular WBA champions must periodically defend their titles against whomever is rated the Official Contender -- sometimes also referred to as the "Mandatory" Contender -- as determined by the winner of an "elimination bout."  M'Baye I, 429 F. Supp. 2d at 662-63; see also WBA Reg. 5.1.  Official Contender status gives fighters the "privilege and the right to fight the champion on the next mandatory due date." (Pl.'s Ex. 2 at 39).

Under Regulation 5.1.3,

> [W]hen a boxer obtains the title of World
> Champion, in an eliminatory fight for a
> Vacant Title, in any category, except the
> Heavyweight division, he must defend the
> title against the Official Contender of his
> category within no more than ONE HUNDRED

4

> TWENTY (120) days counted from the date on
> which he obtains the title.

(WBA Reg. 5.1.3).

Under Regulation 5.1.4, a World Champion who was not

the Official or Mandatory Challenger from his division must

> defend his title against the Official
> Contender of his category within no more than
> ONE HUNDRED TWENTY (120) days counted from
> the date on which he obtained that title.
> From then onwards he shall defend his title
> at intervals no longer than NINE (9) months
> against the Official Contender, unless he is
> granted an exception according to what is
> stipulated under the Rule 19 of these
> Regulations.

(WBA Reg. 5.1.4).

Regulation 5.1.6 further provides that

> [w]ithin sixty (60) days prior to the date of
> the mandatory defense, no world champion may
> sign an agreement to defend his title, nor
> may he defend it against a boxer who is not
> the Official Contender.

(WBA Reg. 5.1.6).

Despite these specified deadlines for defense of the

championship, the WBA Regulations do provide for flexibility.

Under Regulation 5.1.11,

> [t]he World Championships has the faculty to
> reduce and/or modify any of the terms
> established for the mandatory defenses in
> those cases in which the champion has not
> complied with the period established by the
> WBA according to articles 5.1.3 and 5.1.4. of
> the World Championships Regulations.

(WBA Reg. 5.1.11).

Additionally, as referenced in Regulation 5.1.4,

Regulation 19.2 provides that champions may request "a special

5

permit or exception" to schedule a non-mandatory fight for a
variety of reasons.

> Any World Champion who is recognized by the
> World Boxing Association may request through
> the World Championships Committee, a special
> permit or exception for the following: . . .
>
> 3. To unify the World title, with a title in
> a similar category of another entity. . . .
>
> 5. To carry out a fight of importance and
> significance for the boxing world, at which
> the presence of the World Boxing Association
> is desirable.

(WBA Reg. 19.2).  These requests are determined by a vote by the
"championship committee" and require the payment of a fee.  (See
WBA Reg. 19.5, 19.6; see also Pl. Ex. 2 at 60, 79).

### 3.   **M'Baye as the WBA's Official Contender**

M'Baye has been bypassed three times as Official
Contender while he awaited the opportunity to challenge the World
Champion of the super lightweight division of the WBA for the
title.

#### a.   **The Hurtado-Harris Fight**

In 2002, M'Baye became the WBA's Official Contender in
the super lightweight division after paying the relevant
sanctioning fee and defeating a boxer named Khalid Rahilou in an
elimination bout.  M'Baye I, 429 F. Supp. 2d at 663.  Under the
WBA rules, M'Baye should have fought champion Diosbelys Hurtado
by September 11, 2002 for the regular championship title.  Id.
The WBA, however, granted an exception and permitted a fifteenth-
ranked boxer named Vivan Harris to fight Hurtado instead of
M'Baye.  Id.  Harris, who was promoted by Main Events, defeated

6

Hurtado to win the regular championship.  Thereafter, on June 12,
2003, M'Baye fought Harris and lost -- the only loss of M'Baye's
professional career up to then.  Id.

### b.   The Harris-Maussa Fight

In October 2004, M'Baye again became the WBA's number
one Official Contender after paying the relevant sanctioning fee
and defeating a boxer named Andreas Kotelnik in an elimination
bout.  Id. at 664; see also Pl. Exs. 13, 19.  As Official
Contender, M'Baye should have been granted a fight against
Harris, but once again the WBA granted an exception and permitted
fifteenth-ranked Carlos Maussa, also promoted by Main Events, to
fight Harris instead.  M'Baye I, 429 F. Supp. 2d at 664.  The
Harris-Masussa fight was within the sixty-day period when a
champion may not defend his title against any fighter other than
the Official Contender, under Rule 5.1.6.  Maussa defeated Harris
on June 25, 2005 to win the regular championship.  Id.

### c.   The Maussa-Hatton Fight

M'Baye remained the Official Contender after Maussa's
win.  Under Regulation 5.1.4, Maussa was required to defend the
title against M'Baye within 120 days -- that is by October 23,
2005.  Id.  M'Baye sought the opportunity to challenge Maussa,
writing to the WBA in early September 2005 to request that "no
further extensions, voluntary defenses or regulation 19 'special
permits' be granted" until a Maussa-M'Baye bout took place.  (Pl.
Ex. 13).  On September 12, 2005, however, a super lightweight
fighter from the International Boxing Federation named Ricky

7

Hatton announced that he would be fighting a unification bout against Maussa in November 2005. M'Baye I, 429 F. Supp. 2d at 665. Maussa had signed a promotion agreement with Main Events on September 8, 2005 to fight Hatton for the super lightweight championship. (Pl. Ex. 25). The agreement was not contingent upon WBA granting an exception for the fight. (Id.). One of M'Baye's representatives immediately objected to the WBA about the Maussa-Hatton fight, on the basis that M'Baye was the Official Contender and was entitled to fight Maussa for the WBA title under Rule 5.1.4. M'Baye I, 429 F. Supp. 2d at 665.

On September 22, 2005, Main Events requested a special permit under Rules 19.2.3 and 19.2.5 for an exception to allow Maussa to fight Hatton. (Pl. Ex. 28). On September 23, 2005, Hatton's promoter also sought WBA sanction of the Maussa-Hatton bout. (Pl. Ex. 30). The same day, the WBA executive vice-president Gilberto Jesus Mendoza sent out a vote request to the championship committee on whether to grant a special exception under Rule 19.2.3 or 19.2.5 for the Maussa-Hatton fight. (Pl. Ex. 14). The request did not advise the members of the committee that M'Baye objected to the Maussa-Hatton bout. (Id.). WBA's championships committee voted to grant the special permit that same day. (Id.). M'Baye was not informed until two weeks later, whereupon he appealed the WBA's granting of the permit. See M'Baye I, 429 F. Supp. 2d at 665. The WBA denied M'Baye's appeal on November 8, 2005. Id. On November 26, 2005, Hatton defeated Maussa to become the new WBA Unified Champion.

8

**B.   Procedural History**

        The two cases each have long and complicated procedural
histories.

**1.   M'Baye I**

        M'Baye commenced his action against the WBA in New York
state court on November 9, 2005, the day after the WBA denied his
appeal.  He sought to enjoin the Hatton-Maussa bout and brought
claims for breach of contract and breach of the covenant of good
faith and fair dealing.  The suit was removed on November 14,
2005, based on diversity of the parties.

        Both Hatton and Maussa were granted leave to intervene
as defendants.  English represented Maussa in his intervention
application, stating that "Mr. Maussa did not sign a contract to
participate in the bout [with Hatton] until the WBA World
Championship committee issued its sanctioning of the bout."
(English Ex. 17).  English made a substantially similar factual
statement in a November 15, 2005 letter to the Court.  (English
Ex. 18).  On November 21, 2005, I declined to enjoin the Hatton-
Maussa fight, but did issue an order temporarily enjoining the
WBA from sanctioning any bout between the winner of the fight and
anyone other than M'Baye, unless M'Baye were first offered the
fight and declined.  (Nov. 21, 2005 Order).  The temporary
restraining order was converted to a preliminary injunction on
January 20, 2006.  (Jan. 20, 2006 Order).  Hatton and Maussa were
subsequently granted leave to withdraw as parties from the
action.

                                9

On April 28, 2006, I denied the WBA's motion to dismiss for lack of personal jurisdiction and insufficient service of process.  M'Baye I, 429 F. Supp. 2d 652 (S.D.N.Y. 2006).  I vacated the preliminary injunction that had been in place since May 5, 2006, and instead enjoined the WBA from sanctioning any bout for the WBA regular championship in the super lightweight division unless the bout involved M'Baye or unless M'Baye was first offered the fight and declined it.  M'Baye I, 429 F. Supp. 2d at 670.  I then permitted M'Baye to amend his complaint and add claims for violations of the Ali Act and for unjust enrichment.  M'Baye I, No. 05 Civ. 9581, 2006 WL 2090081 (S.D.N.Y. July 28, 2006).  On March 21, 2007, I granted in part the WBA's motion to strike some allegations from the complaint as well as plaintiff's punitive damages and third-party beneficiary claims, but denied the WBA's motion for summary judgment on M'Baye's Ali Act claim.  M'Baye I, No. 05 Civ. 9581, 2007 WL 844552 (S.D.N.Y. March 21, 2007).  M'Baye filed a third amended complaint with the WBA's consent on April 9, 2007.

### 2.   **M'Baye v. Main Events and English**

M'Baye filed a complaint against Main Events, English, and other defendants on May 4, 2006, alleging racketeering and conspiracy under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), tortious interference with plaintiff's contract with the WBA, tortious interference with prospective economic advantage, and unjust enrichment.  M'Baye also alleged that English violated New

10

York Judiciary Law § 487(1) based on representations English made to the Court concerning when Maussa signed the contract to fight Hatton. M'Baye subsequently withdrew his claims against all defendants in the action except Main Events and English. On February 7, 2007, I dismissed M'Baye's RICO claims and his claims of tortious interference with prospective economic advantage and unjust enrichment against Main Events and English. <u>M'Baye II</u>, No. 06 Civ. 3439, 2007 WL 431881 (S.D.N.Y. Feb. 7, 2007). M'Baye was permitted to proceed with his tortious interference with contract claims against Main Events and English and his § 487 claim against English. <u>Id.</u>

The two cases were consolidated for purposes of discovery only. Discovery closed in October 2008 and these motions for summary judgment followed. I consider the WBA's motion and Main Events' and English's motions separately below.

## **DISCUSSION**

### A. **Summary Judgment Standard**

Summary judgment is appropriate only where the parties' submissions "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). Summary judgment is inappropriate if the Court, resolving all ambiguities and drawing all reasonable inferences against the moving party, finds that the dispute about a material fact is "such that a reasonable jury could return a verdict for the nonmoving party." <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986).

To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). As the Supreme Court held in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted). The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. Nat'l Union Fire Ins. Co. v. Deloach, 708 F. Supp. 1371, 1379 (S.D.N.Y. 1989) (quoting R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir. 1996) (internal citations and quotations omitted).

## B. The WBA's Motion

The WBA moves for summary judgment on all of M'Baye's remaining claims against it: violations of the Ali Act; breach of contract; and unjust enrichment. For the reasons that follow, the WBA's motion is granted as to the Ali Act and unjust enrichment claims, but denied as to M'Baye's breach of contract claim.

12

## 1.    **The Ali Act Claim**

### a.    **Applicable Law**

The Ali Act provides that:

> A sanctioning organization shall not be
> entitled to receive any compensation,
> directly or indirectly, in connection with a
> boxing match, until, with respect to a change
> in the rating of a boxer previously rated by
> such organization in the top 10 boxers, the
> organization --

> (1) posts a copy, within 7 days of such
> change, on its Internet website or home page,
> if any, including an explanation of such
> change, for a period of not less than 30
> days; and

> (2) provides a copy of the ratings change and
> explanation to an association to which at
> least a majority of the State boxing
> commissioners belong.

15 U.S.C. § 6307c(c).

The Act provides for a private right of action:

> Any boxer who suffers economic injury as a
> result of a violation of any provision of
> this Act may bring an action in the
> appropriate Federal or State court and
> recover the damages suffered, court costs,
> and reasonable attorneys fees and expenses.

15 U.S.C. § 6309(d).

### b.    **Application**

The WBA's motion for summary judgment dismissing

M'Baye's Ali Act claim is granted, as the claim cannot be

sustained as a matter of law.  The WBA's granting of exceptions

to other fighters is not a change in M'Baye's rating triggering

the WBA's § 6307c(c) obligations.  By the plain language of §

13

6307c(c), the notice and explanation requirements of the statute apply only when there is "a change in the rating of a boxer previously rated by such organization in the top 10 boxers." Here, there is no dispute that M'Baye was rated number one and that he was the Official Contender during the time periods in question. Additionally, there is no dispute that M'Baye's official rating did not change when the WBA sanctioned the Hurtado-Harris, Harris-Maussa, and Maussa-Hatton bouts. Thus no reasonable jury could find that the event that would have triggered the WBA's obligations under the statute -- a change in M'Baye's rating -- occurred.

M'Baye argues that the WBA reduced his rating de facto by permitting other fighters to move ahead of him to fight for the championship title. (Pl. Br. 22-23). This argument conflates the WBA's rating system with its rules regarding the timing of championship bouts. M'Baye has provided no evidence to show that his rating changed, effectively or otherwise.

Moreover, the WBA's regulations explicitly permit exceptions in the scheduling of championship bouts, such that lower-ranked fighters may challenge the champion ahead of the number one Official Contender. (See WBA Regs. 5.1.11, 19.2). M'Baye provides no evidence to dispute the WBA's assertion that neither the WBA nor other sanctioning organizations regard the granting of exceptions as causing a change in a boxer's rating. (See Majeski Decl. Ex. A at 12; Duggan Decl. ¶¶ 14-15; Mendoza Decl. ¶¶ 15-16; Peoples Decl. ¶¶ 6-8).

14

M'Baye argues that the statute's legislative history shows that the Ali Act was in part passed as a response to concerns about the "arbitrary and manipulative" nature of the ratings system. See S. Rep. No. 106-83 at 11-12 (1999). While true, M'Baye seeks to have the statute do too much by seeking an expansive interpretation of the term "rating." The Ali Act simply does not say what M'Baye wants it to say. Nor is there anything in the legislative history to suggest that passing over a fighter for required fights constitutes a de facto change in ranking. Accordingly, the WBA's motion for summary judgment dismissing M'Baye's Ali Act claim is granted.

## 2. **Breach of Contract Claim**

### a. **Applicable Law**

"The elements of a breach of contract claim under New York law are as follows: (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages." 24/7 Records, Inc. v. Sony Music Entm't, Inc., 429 F.3d 39, 42 (2d Cir. 2005); accord O.D.F. Optronics Ltd. v. Remington Arms Co., No. 08 Civ. 4746 (DLC), 2008 WL 4410130, at *8 (S.D.N.Y. Sept. 26, 2008)(same).

"Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995). The covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the

15

other party to receive the fruits of the contract." Id. (citations and internal quotations marks omitted). "The duty of good faith and fair dealing, however, is not without limits." Id. (citations and internal quotations marks omitted). "The boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract." Cross & Cross Props., Ltd. v. Everett Allied Co., 886 F.2d 497, 502 (2d Cir. 1989). The implied covenant "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 408 (2d Cir. 2006) (citation and internal quotation marks omitted).

### b.   **Application**

The WBA's motion is denied, as a reasonable jury could find for M'Baye on his breach of contract claim against the WBA. As an initial matter, a reasonable jury could find that M'Baye had an enforceable agreement with the WBA based on his payment -- and the WBA's acceptance -- of sanctioning fees with the understanding that M'Baye would be granted a championship bout if he attained the status of Official Contender. A reasonable jury could also find that, as part of the agreement, the WBA would interpret its rules and regulations as to M'Baye fairly. See M'Baye I, 429 F. Supp. 2d at 668 n.8.

The WBA argues that M'Baye's admission that he never read the WBA rules undermines his claim and that M'Baye has

16

presented no evidence that he was promised a championship bout
within a certain time frame.  The WBA's arguments are unavailing,
at least on summary judgment.  A jury could find that M'Baye
reasonably expected that the WBA would follow its rules in the
scheduling of a championship bout, regardless of whether anyone
personally guaranteed such a bout to him.  Additionally, whether
M'Baye actually read the rules himself is of limited relevance.
See Jesmer v. Retail Magic, Inc., 55 A.D.3d 171, 184 (2d Dep't
2008) ("the fact that [plaintiff] did not actually read
[agreement] is not necessarily dispositive").

        Second, although the WBA's rules do provide for
exceptions in the scheduling of championship bouts, a reasonable
jury could nevertheless find for M'Baye on the theory that (1)
the WBA explicitly breached its regulations, and/or (2) it
breached the implied covenant of good faith and fair dealing in
its dealings with M'Baye.  M'Baye was bypassed on three occasions
for the championship fight despite his position as the top-ranked
Official Contender.  Although M'Baye now concedes that he
acquiesced to being bypassed for the Hurtado-Harris bout in 2002,
a reasonable jury could find that the exceptions under the
regulations did not apply to the WBA's sanctioning of the Harris-
Maussa or Maussa-Hatton fights.

        Additionally, even if a jury were to find no breach of
the express terms of M'Baye's agreement with the WBA, it could
still find that M'Baye's right to receive the benefits of the
contract was adversely affected and that M'Baye's reasonable

                             17

expectations were not met by virtue of being repeatedly bypassed.
See Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.,
103 F. Supp. 2d 711, 736 (S.D.N.Y. 2000) ("While a party may
breach the implied duty of good faith and fair dealing even if it
has not breached the express terms of the contract, a party
breaches this implied duty only when it does something that
destroys or injures the right of another party to receive the
benefits of the contract."). M'Baye has provided evidence from
which a jury could find that the WBA acted in bad faith in
interpreting its own rules, including evidence showing that
Maussa obtained a special permit to fight Harris ahead of M'Baye
without payment of a fee (Pl. Ex. 22), and that Maussa was not in
the WBA ratings prior to his fight with Harris being arranged
(Pl. Ex. 2). Upon becoming champion, Maussa was given informal
permission by WBA executive vice president Gilberto Jesus Mendoza
to fight whoever he wanted, instead of M'Baye. (Pl. Ex. 2 at 95,
99; see also Pl. Exs. 25-30 (showing that fight was arranged
without contingencies in the event of WBA denial of the special
permit)). The speed with which the WBA championship committee
approved Maussa and Hatton's requests for a special permit for
the Maussa-Hatton bout, in contrast with the processing of
M'Baye's objection and appeal, supports M'Baye's claim as well.
Altogether, then, M'Baye has provided sufficient evidence to
raise a genuine issue of material fact about the WBA's good faith
performance.

        The WBA argues that it has granted exceptions to the
mandatory defense requirements on numerous occasions, such that

18

M'Baye was not singled out in any way. Whether this is true,
however, is a question of fact that must be resolved by the fact-
finder at trial. The WBA also argues that the Court may not
"second guess" the WBA's interpretation of its own rules (WBA Br.
at 11), and claims that even the bad faith failure of an
organization to comply with its rules does not give rise to a
right to recover damages, only injunctive relief (WBA Reply at 7-
8 (citing Mason v. Central Suffolk Hosp., 3 N.Y.3d 343 (2004),
Maas v. Cornell Univ., 94 N.Y.2d 87 (1999), and Tedeschi v.
Wagner Coll., 49 N.Y.2d 652 (1980)). The cases cited by the WBA
as precluding damages claims are distinguishable, however, as
each involved unique policy considerations -- hospitals and their
bylaws in Mason and college and university discipline in Maas and
Tedeschi. See Mason, 3 N.Y.3d at 348; Maas, 94 N.Y.2d at 92;
Tedeschi, 49 N.Y.2d at 658. As I have noted in prior opinions in
this case, while courts should generally avoid conflicts
regarding the interpretation of an organization's rules, they may
intervene where a plaintiff raises legitimate allegations of "bad
faith or illegality." M'Baye I, 429 F. Supp. 2d at 668 (citing
Crouch v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 845 F.2d
397, 403 (2d Cir. 1988)). Here, the evidence in the record
raises legitimate questions about the WBA's bona fides in
interpreting its rules. Accordingly, summary judgment is
inappropriate.

          Finally, M'Baye has presented sufficient evidence of
damages. "[W]hile a plaintiff must prove the existence of

                              19

damages with certainty, . . . [he] need not prove the amount of loss with certainty." MTV Networks v. NVE Pharm., No. 01 Civ. 1699 (DC), 2002 WL 1203853, at *6 (S.D.N.Y. June 3, 2002). Under New York law, where "the existence of damage is certain, and the only uncertainty is as to its amount . . . the burden of uncertainty as to the amount of damage is upon the wrongdoer." Boyce v. Soundview Tech. Group, Inc., 464 F.3d 376, 391 (2d Cir. 2006). Here, M'Baye has set forth some, albeit few, details about his damages. (WBA Exs. F, G). While uncertainty remains about the amount and type of damages M'Baye would be entitled to, the existence of some damages (including nominal damages) is not entirely speculative. Accordingly, the WBA's motion for summary judgment to dismiss M'Baye's breach of contract claim is denied.

## 3.    Unjust Enrichment Claim

The WBA's motion for summary judgment as to M'Baye's unjust enrichment claim is granted, and the claim is dismissed. M'Baye did not oppose the WBA's motion for summary judgment on his unjust enrichment claim. He further admits that he makes no claims for damages on the claim. (See WBA 56.1 ¶ 71; Pl. Response 56.1 ¶ 71). When one party fails to respond to an opposing party's argument that its claim must be dismissed, courts may exercise their discretion and deem the claim abandoned.  See Santiago v. Newburgh Enlarged City School Dist., 485 F. Supp. 2d 327, 338 (S.D.N.Y. 2007); Lipton v. County of Orange, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004); Jessamy v. City of New Rochelle, 292 F. Supp. 2d 498, 515, FN21 (S.D.N.Y. 2003);

20

Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003). Here, dismissal is appropriate. Accordingly, I deem M'Baye's unjust enrichment claim abandoned and grant the WBA's motion for summary judgment to dismiss the claim.

## C.   **Main Events' and English's Motions**

Main Events and English move separately for summary judgment to dismiss M'Baye's claims against them. M'Baye alleges tortious interference with contract as to both defendants and violations of New York Judiciary Law § 487(1) as to English.

### 1.   **Tortious Interference with Contract**

#### a.   **Applicable Law**

Under New York law, a plaintiff must show the following for a tortious interference with contract claim: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of contract; and (5) damages resulting therefrom. M'Baye v. New Jersey Sports Prod., 2007 WL 431881, at *10 (citing Kirch v. Liberty Media Corp., 449 F.3d 388, 401-02 (2d Cir. 2006)).

Defendant's procurement of a breach must not only be intentional but also "improper." White Plains Coat & Apron Co. v. Cintas Corp., 8 N.Y.3d 422, 426-27 (2007) (a competitor has the right to solicit business and liability is limited to "improper inducement" of breach, with ultimate liability

21

"depend[ing] on a showing that the inducement exceeded a 'minimum
level of ethical behavior in the marketplace'").

## 2.   **Application**

Main Events' and English's motions for dismissal of the
tortious interference of contract claims are granted, as no
reasonable jury could find that either defendant intentionally
and improperly procured the breach of M'Baye's agreement with the
WBA.  As to Main Events, M'Baye fails to present evidence from
which a jury could find that Main Events improperly induced the
WBA to permit other boxers to fight for the championship title
ahead of M'Baye.  Nor does M'Baye present evidence of other
improper conduct by Main Events in connection with the Hurtado-
Harris bout, the Harris-Maussa bout, or the Maussa-Hatton bout.
To the extent there were irregularities in the WBA's granting of
exceptions to Main Events-promoted fighters, the evidence in the
record supports only a jury finding in favor of M'Baye's claim
against the WBA, not Main Events.

Indeed, the facts cited by M'Baye in his opposition
papers relate only to the granting of exceptions by the WBA to
fighters promoted by Main Events, but not to any actual actions
taken by Main Events.  (Pl. Br. at 27-30).  Even if a jury were
to find that then-vice president of Main Events Carl Moretti
"boasted" of his relationship with the WBA, this fact is
insufficient for a reasonable jury to find intentional
interference by Main Events.  Similarly, inconsistent statements
by Moretti regarding when Harris requested a special permit to

22

fight Hurtado are inapposite.  M'Baye claims the facts show an

"improper relationship between Main Events and the WBA," but he

points to no evidence of unethical behavior; the fact that Main

Events boasted of or sought to take advantage of a close

relationship is not enough to support a verdict in M'Baye's

favor.

For the same reasons, the evidence in the record is

wholly insufficient to support a verdict against English.  In his

opposition papers, M'Baye does not cite to any actions taken by

English that would support his claim.  Additionally, he fails to

provide any evidence of English's malicious intent or personal

interest, as required for a finding of liability.  "[W]here a

plaintiff fails to expressly allege that his adversary's attorney

was motivated by malicious intentions, the conduct complained of

does not give rise to liability as a matter of law."  State v.

Poulson, 26 A.D.3d 650, 651 (3d Dep't 2006); see also Four Finger

Art Factory, Inc. v. Dinicola, No. 99 Civ. 1259, 2001 WL 21248,

at \*7 (S.D.N.Y. Jan. 9, 2001) ("If any attorney or any other

agent of a contracting party takes actions that induce a breach

of contract while acting within the scope of an agency

relationship and is not motivated by personal gain, the attorney

or agent is not liable to the third party for tortious

interference with contract."); New Dimensions Spa Inc. v. Fitness

Place Rockville Centre, N.Y., Inc., 187 A.D.2d 493, 494 (2d Dep't

1992) (plaintiff must show that the attorney took "a specific

fraudulent, malicious, or tortious act" for tortious interference

with contract).

Accordingly, the motions by Main Events and English for summary judgment dismissing M'Baye's tortious interference with contract claims are granted, and the claims are dismissed.

## 2. **M'Baye's Judiciary Act Claim Against English**

### a. **Applicable Law**

Section 487(1) of the New York Judiciary Law provides, in relevant part, that:

> An attorney or counselor who . . . [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party . . . [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

N.Y. Jud. Law. § 487(1) (McKinney 2005).

Plaintiff must thus show that the defendant attorney (1) is guilty of deceit or collusion, or consents to any deceit or collusion; (2) had an intent to deceive the court or any party; and (3) that damages were caused by the deceit. M'Baye II, 2007 WL 431881, at *13; see also Amalfitano v. Rosenberg, 428 F. Supp. 2d 196, 207 (S.D.N.Y. 2006).

"A single act or decision, if sufficiently egregious and accompanied by an intent to deceive, is sufficient to support liability." Trepel v. Dippold, No. 04 Civ. 8310 (DLC), 2005 WL 11707010, at *4 (S.D.N.Y. May 9, 2005).

### b. **Application**

English's motion for summary judgment as to M'Baye's § 487 claim is granted. M'Baye claims English misrepresented to

24

the Court, on more than one occasion, that Maussa signed a contract to fight Hatton after the WBA issued a special permit for the Maussa-Hatton bout, when in fact, Hatton had signed an agreement before the permit was granted.  Even assuming English made misrepresentations to the Court and that such misrepresentations were sufficiently egregious to support a finding of liability, M'Baye's claim fails because he cannot establish that he was injured by the misrepresentations.

M'Baye argues English's misrepresentations contributed to the Court's decision to deny M'Baye's request for a temporary restraining order enjoining the Maussa-Hatton bout scheduled for November 26, 2005.  (Pl. Br. at 32-33).  No evidence in the record supports such a finding.  I did not rely -- explicitly or implicitly -- on English's representations as to the date Maussa signed the contract in any of my rulings.  Additionally, it would be wholly inappropriate for a reasonable jury to probe further and consider whether "the misrepresentation by Mr. English had its desired effect on the Court's decision-making process."  (Pl. Br. at 33).  Accordingly, English's motion is granted and M'Baye's § 487 claim is dismissed.

## D.   **Motion to Strike**

Main Events' motion to strike the report and preclude the testimony of expert Duke McKenzie is denied without prejudice as moot, since all claims against Main Events are dismissed.  To the extent the WBA sought to join in Main Events' motion to strike, it may renew the motion before trial.

## CONCLUSION

For the foregoing reasons, the WBA's motion for summary judgment is denied in part and granted in part.  M'Baye may proceed with his breach of contract claim against the WBA.  The parties in M'Baye v. World Boxing Ass'n, No. 05 Civ. 9581 (DC) shall appear for a pre-trial conference on August 21, 2009 at 11:30 a.m.

Main Events' and English's motions for summary judgment are granted, and the complaint in the action against them is dismissed.  Main Events' motion to strike is denied as moot.  The Clerk of the Court shall enter judgment accordingly in M'Baye v. New Jersey Sports Prod., No. 06 Civ. 3439 (DC), with costs but without attorneys' fees.

SO ORDERED.

Dated:     New York, New York
           July 28, 2009

                                    DENNY CHIN
                                    United States District Judge

26

## APPEARANCES

Attorneys for Plaintiff Souleymane M'Baye:

        PROFETA & EISENSTEIN
           By:   Jethro Eisenstein, Esq.
        14 Wall Street, 22nd Floor
        New York, New York  10005

Attorneys for Defendant World Boxing Association:

        McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
           By:   Brian J. Carey, Esq.
               I. Michael Bayda, Esq.
               Jay A. Katz, Esq.
        Wall Street Plaza
        88 Pine Street, 24th Floor
        New York, New York  10005
           By:   Linda P. Torres
        Three Gateway Center
        100 Mulberry Street
        Newark, New Jersey  07102

Attorneys for Defendant New Jersey Sports Production, Inc., d/b/a
Main Events:

        ORLOFF, LOWENBACH, STIFELMAN & SIEGEL, P.A.
           By:   Laurence B. Orloff, Esq.
               Samuel Feldman, Esq.
        101 Eisenhower Parkway
        Roseland, New Jersey  07068

Attorneys for Defendant Patrick C. English:

        KAVANAUGH, MALONEY & OSNATO, LLP
           By:   James J. Maloney, Esq.
                David F. Bayne, Esq.
               Stephen Mark Cordero, Esq.
        415 Madison Avenue
        New York, New York  10017